The FUND OF FUNDS, LIMITED, F. O. F. Proprietary Funds, Ltd., and IOS Growth Fund, Limited a/k/a Transglobal Growth Fund, Limited, Plaintiffs,

v.

ARTHUR ANDERSEN & CO., Arthur Andersen & Co. (Switzerland), and Arthur Andersen & Co., S. A., Defendants.

No. 75 Civ. 540.

United States District Court, S. D. New York.

June 30, 1977.

**86**

Milgrim, Thomajan & Jacobs, New York City by George L. Graff, David P. Langlois, Robert A. Meister, Robert Thomajan, New York City, for plaintiffs.

Breed, Abbott & Morgan, New York City by Edward J. Ross, James D. Zirin, James R. Peterson, New York City, Wilson & McIlvaine, Chicago, Ill. by Charles W. Boand, Chicago, Ill., for defendants.

## MEMORANDUM

STEWART, District Judge:

### INTRODUCTION

Presently before the Court is an attorney disqualification motion in *Fund of Funds, Limited, et al. v. Arthur Andersen & Co., et al.,* ["*FOF v. Andersen*" or "*Andersen action*"]. To fully evaluate this motion, the Court must examine the circumstances sur-

rounding the investigation of both this case, and *Fund of Funds, Ltd., et al. v. John M. King, et al.,* 74 Civ. 1981 ["*FOF v. King*" or "*King* action"]. Both *FOF v. Andersen* and *FOF v. King* arise out of a common series of transactions including the purchase, valuation, and revaluation of certain natural resource assets, and the payment of a management fee on the revaluation of these assets.

*FOF v. King* was brought by The Fund of Funds, Limited, F.O.F. Proprietary Funds, Ltd., and IOS Growth Fund, Limited, a/k/a Transglobal Growth Fund, Limited,[1] who are represented by the law firms of Morgan Lewis & Bockius ["Morgan Lewis"] and Milgrim Thomajan & Jacobs ["Milgrim Thomajan"]. All of the principals allegedly involved in the natural resource asset transactions were sued in *FOF v. King*, with the exception of Arthur Andersen & Co., ["Andersen" or "Arthur Andersen" or "AA"], the auditors for all plaintiffs and for IOS.

Andersen was sued separately nine months after the *King* complaint was filed,[2] with Milgrim Thomajan listed as counsel of record for the plaintiff Funds. Presently before the Court is defendant Andersen's motion to disqualify Milgrim Thomajan *and* Morgan Lewis from any further participation in the conduct of the *FOF v. Andersen* action.

The basis of Andersen's motion is that Morgan Lewis, who had acted as Andersen's regional counsel in the Philadelphia area for at least 15 years prior to the filing of this suit, agreed to conduct an investiga-

tion for FOF with full knowledge that its own client, Andersen, would probably be implicated in any investigation. Defendant claims that Morgan Lewis not only investigated, but ultimately sued, its own client. While Morgan Lewis is not named as the attorney of record on the Andersen complaint, Andersen claims that Milgrim Thomajan, the attorney of record, is just a "hand-picked stand-in or *alter ego*"[3] of Morgan Lewis.

Milgrim Thomajan, on the other hand, claims that Morgan Lewis is not functioning as counsel for FOF in the Andersen action, and has had no involvement with either the investigation or institution of this action. It claims that from the very inception of Morgan Lewis' relationship with FOF, Morgan Lewis made it clear it would not consider or participate in any investigation or discussion involving whether or not FOF had any claim which could be asserted against Arthur Andersen. Milgrim Thomajan claims that it conducted the Andersen investigation and wrote the complaint without in any way consulting Morgan Lewis.[4] Milgrim Thomajan asserts that it is a separate and distinct entity from Morgan Lewis, and that it has no connection to Arthur Andersen or Morgan Lewis which would create a conflict of interest.

To put the motion in context, it is necessary first to summarize the history of the Fund of Funds suits, the relationship of the attorneys and the parties, and the investigation which led to the complaints in the *King* and *Andersen* actions.

---

1. The plaintiffs are the same in *FOF v. Andersen* and *FOF v. King*. The plaintiffs are three mutual funds formerly managed by Investors Overseas Services, Ltd. ["IOS"]. Plaintiffs Fund of Funds, Limited and IOS Growth Fund, Limited, are two of the four "IOS Dollar Funds"; plaintiff FOF Proprietary Funds is a wholly-owned subsidiary of Fund of Funds, Limited. Unless otherwise noted, the plaintiffs will be referred to collectively as "FOF", "The Funds" or "Fund of Funds".

2. Defendant Andersen alleges that the reason that two separate actions were brought (rather than including the auditors in the suit with the principals of the companies involved), is because of the conflict of interest Morgan Lewis

had in bringing a suit against Andersen. The deposition testimony is not enlightening on this point. Given the common nature of the transactions involved and the facts to be proved, the Court is hardpressed to find another reason. However, we make no finding on the motivation.

3. Ross affidavit, ¶ 7.

4. With the exception of the review by a Morgan Lewis attorney of the allegations in the Andersen complaint which are common to the *King* action—an incident which will be discussed much more fully *infra*.

## FACTS

On June 28 and 29, 1973, in Luxembourg, a meeting of international regulatory authorities was held to discuss what these bodies could do in common to safeguard "the interests of the investors in the so-called I.O.S. Dollar Funds."[5] It was agreed at that meeting that

> ". . . each of the Dollar Funds should be liquidated in accordance with the laws of the jurisdiction of its organization. . . . Accordingly, the Banking Commissioner of Luxembourg stated his intention to institute proceedings in Luxembourg for the appointment of a liquidator for IIT and its Management Company, and the Chairman of the Ontario Securities Commission expressed a similar intention in respect of The Fund of Funds, Limited and Transglobal Growth Fund, Limited."[6]

John Orr was subsequently appointed by the Supreme Court of Ontario as the Canadian permanent liquidator of the Fund of Funds, Limited, F.O.F. Proprietary Funds, Ltd., and IOS Growth Fund, Limited, a/k/a Transglobal Growth Fund, Limited, the three plaintiffs in this action. Orr then appointed the law firm of Borden & Elliot of Toronto, Canada, to be his general solicitors[7] ". . . with the power to appoint such other solicitors in other jurisdictions as they deem advisable" (Orr Dep. Exhibits 4 and 5). Shortly thereafter, Morgan Lewis was appointed to assist Borden &

Elliot in the United States (Cihra Dep. p. 32; Orr Exhibit 16).

Morgan Lewis claims that from the inception of its representation of the liquidator it made it clear that it could not take part in any investigation or action regarding Arthur Andersen. Morgan Lewis took this position because it was then Arthur Andersen's regional counsel in the Philadelphia area and had been such for approximately 15 years. While the Court does not know the details of Morgan Lewis' representation of Arthur Andersen for those 15 years, it is clear that the firm never represented Andersen with respect to any matters concerning the defendants in *FOF v. King* or any of the persons, entities or transactions involved in the purchase, valuation or revaluation of the natural resource assets involved in this case.[8] However, Morgan Lewis did acquire through its representation, knowledge of Andersen's trade practices and procedures, and had at least some access to Andersen's files and internal memoranda.[9]

Letters written by Borden & Elliot several months after Morgan Lewis was appointed cast doubt on how clearly Borden & Elliot understood the extent and nature of Morgan Lewis' conflict.[10] However, Morgan Lewis knew of its representation of Andersen at the time the firm accepted the appointment to assist Borden & Elliot and also was aware of Andersen's possible liabil-

---

**5.** Joint press release by the regulatory authorities, June 29, 1973, which is attached as Annex B to Exhibit B of Affidavit of Robert A. Meister, Esq., in Opposition to Motion to Disqualify ["Meister Affidavit"].

**6.** July 2, 1973 letter of John Schemmer to the Honorable Charles E. Stewart, Jr., Meister Affidavit, Exhibit B. Mr. Schemmer was appointed by this Court in 1973 as permanent receiver in *SEC v. Vesco*, 72 Civ. 5001.

**7.** Orr Dep. Exhibits 4 and 5. There has been considerable discussion in the motion papers about how the appointments of Orr, Borden & Elliot, and Morgan Lewis actually came about. Defendants claim that Morgan Lewis masterminded the appointments of Orr and Borden & Elliot so that Morgan Lewis could be in control. Plaintiffs dispute this assertion. While there may be some testimony to support defendants'

claim that Morgan Lewis was involved at this stage, (see, for example, Orr Dep. pp. 26–28 and 53–55; Cihra Dep. pp. 26–27; Dilks Dep. pp. 45–46, 57–60), the Court does not think this point needs to be resolved as it finds it is not relevant to a determination of the present attorney disqualification motion.

**8.** Wilson Dep. pp. 6–10; Plaintiffs' Memorandum in Opposition to Motion to Disqualify, pp. 11–13 ["Plaintiffs' Memorandum"].

**9.** Wilson affidavit; Wilson Dep. pp. 14, 69–72.

**10.** Orr Exhibits 20 and 23 indicate that while Borden & Elliot realized Morgan Lewis was reluctant to take any action with regard to Andersen, they did not realize that they were precluded from taking such action.

ity.[11] As a result of this awareness, Morgan Lewis informed Borden & Elliot that it would not institute or evaluate claims against Andersen.

Immediately after Morgan Lewis' appointment, it commenced an investigation for the liquidator,

". . . to analyze, examine and review all substantial transactions affecting the interests of the plaintiff funds [Fund of Funds, Limited, and IOS Growth Fund] and their shareholders which had occurred during the period prior to the appointment of the Permanent Liquidator, i. e., during the Cornfeld and Vesco eras" Ross affidavit, Exhibit E.

This investigation led to the institution of approximately 18–20 suits on behalf of the liquidator in the United States. One of these suits was *FOF v. King*. Morgan Lewis spent nine months investigating the natural resource asset transactions prior to bringing the *King* action on May 8, 1974. This investigation involved reviewing thousands of documents that had been amassed from several different sources. Morgan Lewis did not look into the involvement of Arthur Andersen during this investigation; rather, every time the firm found a paper mentioning Andersen, it was put aside and subsequently sent to Borden & Elliot.[12] Any investigation by Borden & Elliot of Andersen's role was held in abeyance until long after the *King* suit was filed.

About a month before the institution of the *King* suit, John Lewis of Morgan Lewis contacted Robert Meister of Milgrim Thomajan to ask if Milgrim Thomajan would assist in contemplated litigation involving Bank of New York ["BONY"], Wilkie Farr & Gallagher ["Willkie Farr"] and others (the defendants in *FOF v. King*).[13] Meister agreed and spent the next month going over documents and reviewing a draft of the complaint (Meister Dep. pp. 86–106). As local counsel, Milgrim Thomajan signed the *King* complaint, with Morgan Lewis listed "of counsel."

11. Morgan Lewis does not deny that it knew Andersen was likely to be sued. In 1974 Park Dilks (a Morgan Lewis partner) wrote a letter to Rino Stradiotto (a Borden & Elliot partner) in which the former recounted a conversation the two had in July of 1973, at which time Morgan Lewis had stated that Andersen ". . . had in fact been auditors for FOF, might have been involved in a $10 million accommodation payment to the management company, and would probably end up being sued." Orr Exhibit 21.

12. A meeting took place in November, 1973, attended by Orr, and attorneys from Morgan Lewis and Borden & Elliot. Handwritten notes of a Borden & Elliot attorney read, "MLB [Morgan Lewis] act for A.A. in some matters and will not give opinion as to their liability but will turn over all they learn and we will have to get opinion elsewhere" (Orr Exhibit 15). A letter written months later by Morgan Lewis to Borden & Elliot states,

"For obvious reasons we have not been seeking out material on AA, and our people have not been instructed to analyze material with a view to determining whether causes of action exist against AA. Nevertheless, it is fair to say that, even though they were not looking for it, if our people had stumbled upon anything which was really hot as to AA, they would have brought it to me, and I would have sent it to your firm. In actual fact, the material which we have accumulated contains very little as to AA. Excluding materials which you already have (e. g., the financial statements), what we have regarding AA can be read in twenty minutes" (Orr Exhibit 24).

However, Morgan Lewis did take some interest in the status of the Andersen investigation. In a letter written in July of 1974, Park Dilks, a Morgan Lewis partner, wrote to Rino Stradiotto, a Borden & Elliot partner, "on a number of occasions after August 3, 1973, we have inquired, primarily of George [George Cihra, a partner of Borden & Elliot] concerning the status of the matter. George was always aware that it was not our affair and that it would be handled by your firm. On two occasions (once to me and once to John Lewis) George even stated that he had begun working on the writ" (Orr Exhibit 21, ¶ 3).

13. The relationship between Morgan Lewis and Milgrim Thomajan on Fund of Funds matters began sometime before. In September, 1973, shortly after Morgan Lewis was appointed by the liquidator, John Lewis contacted Robert Meister to ask if Milgrim Thomajan would act as local counsel and assist Morgan Lewis in representing the liquidator in a suit in the Southern District of New York in which Fund of Funds, Limited, and IOS Growth Fund were named as defendants, *S.E.C. v. Vesco, et al.*, 72 Civ. 5001, (Meister Dep. pp. 8, 18, 28–31). Meister agreed and with Morgan Lewis proceeded to represent the liquidator in this action throughout the fall and winter of 1973.

Shortly after the complaint in *FOF v. King* was filed, a problem arose which caused Borden & Elliot and Morgan Lewis to consider the possibilities that Arthur Andersen might be joined as a third party defendant in *King*, or, depending on the structure of the case, might be directly sued in *King*, thereby obviating the necessity for a separate suit against Andersen. Either possibility raised a question concerning Morgan Lewis' ability to continue to prosecute the *King* action for FOF because of Morgan Lewis' apparent conflict in continuing the prosecution of a suit in which its own client would be a defendant. The problem was discussed at a meeting held in Toronto on May 23 and 24, 1974, attended by representatives of Borden & Elliot, Morgan Lewis and Martin Mensch,[14] New York counsel for Global Natural Resources Properties Limited ["Global"].[15] Mensch had previously asserted that Global, not FOF, owned all the claims arising out of investments in the natural resource assets. Mensch had stated that he was going to bring a suit on behalf of Global against various defendants in the *King* action and against Andersen as well, since he felt that any suit had to include Andersen.

While an accommodation was ultimately worked out between FOF and Global, Morgan Lewis' conduct at this meeting was noteworthy. At one point during the meeting Mensch started to discuss the natural resource asset claims, including one he felt should be brought against Arthur Andersen. At the mention of Andersen's name, the attorneys from Morgan Lewis left the meeting, stating that they could not participate in any discussion involving Andersen.[16] During their absence, Mensch stated that if Andersen was not joined in the *FOF v. King* suit, Fund of Funds might not be able to sue Andersen later, since the failure to join Andersen might leave plaintiffs vulnerable to the defense that they had thereby split the cause of action.[17] Borden & Elliot were upset when they heard this opinion, as they had not meant to forfeit any claim against Andersen. Thus they insisted that the Morgan Lewis attorneys return to the meeting, be filled in on what had transpired in their absence, and given an opinion on the "splitting the cause of action" theory.[18] Morgan Lewis not only gave an oral opinion at the meeting, but also furnished a written opinion on June 10, 1974.[19]

14. Mensch is a partner in the firm of Dornbusch, Mensch & Mandelstam.

15. The relationship of Global to the plaintiff funds is not relevant to the present motion, and thus will not be explained.

16. Mensch Dep. pp. 100–102; Cihra Dep. pp. 164–166.

17. Cihra Dep. pp. 176–77.

18. Cihra Dep. pp. 189–193.

19. The letter to Cihra reads in part as follows:
"As we have previously advised you on several occasions, this firm, because of its past and present representation of Arthur Andersen & Co., cannot express an opinion with respect to the liability (or non-liability) of Arthur Andersen & Co. to The Fund of Funds, Limited, F.O.F. Proprietary Funds Limited and IOS Growth Fund Limited.
"The complaint in the above-captioned action alleges, *inter alia*, that the plaintiffs sustained substantial losses arising out of investments in natural resources acquisitions. During the relevant period, Arthur Andersen & Co. served as the independent accountants for, *inter alia*, The Fund of Funds, Limited,

F.O.F. Proprietary Funds Limited, I.O.S. Growth Fund Limited and King Resources Company. You have requested our opinion as to whether or not the failure to join Arthur Andersen & Co. as a defendant in the above-captioned action constitutes a splitting of a cause of action, thus precluding the plaintiffs from instituting a separate action against Arthur Andersen & Co. for, *inter alia*, the losses sustained by reason of the natural resource investments. Since neither the parties nor the cause of action will be the same, we are of the opinion that the doctrine precluding splitting of causes of action is inapplicable.
"The rule precluding splitting of causes of action is predicated upon the principle that no party should be unnecessarily harassed with a multiplicity of suits. . . .
"Secondly, the rule has no applicability if the causes of action alleged in the two suits are different causes of action even if the causes arose out of the same transaction. . . . In the above-captioned action, we are alleging, *inter alia*, the breach, by BONY, of its duty as a custodian bank and the breach, by Willkie Farr, of its duties as counsel. Any action prosecuted against Arthur

In response to Mensch's suggestion that Andersen be joined as a defendant in *FOF v. King*, Morgan Lewis developed a "contingency plan," which Park Dilks, Jr., the Morgan Lewis partner in charge of Fund of Funds matters, described as follows:

"One solution . . . seemed to be that, if AA [Arthur Andersen] objected to our continued participation, we would drop out of the Natural Resource case but would have so equipped Bob Meister in the meantime that he could carry on. As a precaution we cleared with Meister that he would have no conflict if AA were joined." (Orr Exhibit 21, ¶ 10.)

During July and August, letters [20] were exchanged between Borden & Elliot and Morgan Lewis discussing (1) the contingency plan, (2) the possibility of Mensch bringing his own suit against Andersen and Morgan Lewis ratifying it for FOF (and Mensch ratifying *FOF v. King* in return), or, (3) the possibility of getting Andersen's consent to Morgan Lewis' remaining in the suit even if Andersen were brought in. Donald Scott, the Morgan Lewis partner who had been in charge of Andersen's account for several years, was brought into the discussions with the Morgan Lewis partners handling the FOF account. Scott helped draft Morgan Lewis' responses to Borden & Elliot,[21] and was present at Morgan Lewis discussions involving the possibility of Mensch or Meister bringing suit against Andersen (Scott Dep. pp. 42–43). At the end of July, Scott told Andersen of Morgan Lewis' representation of Fund of Funds [22] and attempted to get Andersen's consent to Morgan Lewis remaining as counsel if Andersen were named as a third party defendant. Andersen did not consent, being concerned about Morgan Lewis' possible conflict. (Lewis Exhibit 5; Boand Affidavit ¶¶ 7–9).

Throughout the spring and summer of 1974, Orr had requested that the question of bringing a separate suit against Arthur Andersen be held in abeyance. In an opinion letter written in August, Morgan Lewis had advised Borden & Elliot as to the applicable statute of limitations for a suit against Andersen, assuring the firm that suit could be brought at a later date.[23] In September and October, 1974, John Warren and George Cihra, Borden & Elliot attorneys, finally began to look into whether or not the evidence supported such a suit (Cihra Dep. p. 292). On January 23, 1975, Borden & Elliot asked Robert Meister of Milgrim Thomajan [24] to consider whether a suit

---

Andersen would allege a breach of a completely separate duty, i. e., the duties of an accountant." (Orr Exhibit 19.)

20. Orr Exhibits 20 and 21; Orr Exhibits 23 and 24.

21. Scott Dep. pp. 41–59.

22. Morgan Lewis first informed Andersen of its representation of portions of the IOS operation in March, 1974, over 6 months after it had been retained. This March conversation was inconclusive, and their representation of FOF was not brought up again until this conversation in July, 1974.

23. "As to when and where the Liquidator might wish to assert such claims, it should be remembered that AA's 1969 auditors letter is dated February 13, 1970, and its 1970 auditors letter is dated January 29, 1971. Thus, if a six-year Statute of Limitations applies, suit can be brought against AA at the Liquidator's convenience. We understand that the Statute is six years in Ontario without proof of fraud. It is six years in New York with proof of fraud. Thus, there has never been the urgency about suing AA that there has been about suing the other defendants." (Orr Exhibit 24.)

24. Milgrim Thomajan had twice previously written Borden & Elliot to "confirm" that they were not to be pursuing claims against Andersen, at the same time mentioning a possible statute of limitations problem as to Andersen and discussing possible theories of action against Andersen. Copies of these letters were always sent to Morgan Lewis. Defendants imply in their papers that these letters amount to improper solicitation on the part of Milgrim Thomajan. The Court questions whether these letters are sufficient to support such a claim, but notes that solicitation does not warrant disqualification. *Fisher Studio v. Loew's, Inc.*, 232 F.2d 199 (2d Cir. 1956); *Ceramco Inc. v. Lee Pharmaceuticals*, 510 F.2d 268 (2d Cir. 1975).

should be brought against Arthur Andersen in the Southern District of New York.[25]

The circumstances surrounding the choice of Meister to represent the liquidator in the suit against Andersen is hotly disputed by the parties. Morgan Lewis claims it had nothing to do with the choice, although it had mentioned Meister's name to Borden & Elliot several times. At the May, 1974, meeting in Toronto when the possibility of Andersen being brought into the *King* action as a defendant was first discussed, Morgan Lewis suggested that Milgrim Thomajan could replace Morgan Lewis if a conflict developed.[26] A July, 1974, letter from Morgan Lewis to Borden & Elliot discussing this same problem stated:

". . . should you decide you require an opinion on U.S. law [respecting Andersen's liability], one possible choice of attorney is Bob Meister who, second to your firm and ours, has more background in this matter than anyone else.

\* \* \* \* \* \*

". . . if AA objected to our continued participation, we would drop out of the Natural Resources case but would have so equipped Bob Meister in the meantime that he could carry on. As a precaution we cleared with Meister that he would have no conflict if AA were joined. Alternatively, other counsel could be engaged. (However, about 40 New York law firms are and/or have already been engaged in the Vesco and IOS related matters and it might be difficult to get anyone with as much to offer as Meister and would be impossible to get anyone with his background)" Orr Exhibit 21, ¶ 5 and ¶ 10.[27]

And an August, 1974 letter from Borden & Elliot to Dilks, a Morgan Lewis partner, concerning Mensch's promise to send a draft complaint of a suit against Andersen to the liquidator reads as follows:

"After GC's [Borden & Elliot attorney] discussion with you and Joe Hennessy [Morgan Lewis attorney] with respect to the possibility of getting Mensch off dead centre by offering the services of Bob Meister to prepare his pleadings, we discussed the matter with Mr. Meister and Mr. Mensch." Orr Exhibit 23.

And in the fall of 1974, when Borden & Elliot's attention turned to Andersen, John Warren, a partner at Borden & Elliot, recalls that Morgan Lewis recommended Meister's firm.

"Q. Was it mentioned in the course of this discussion, or these discussions, that Morgan Lewis had recommended Meister?

A. Yes.

Q. What was the discussion on that subject?

\* \* \* \* \* \*

THE WITNESS: . . . In substance the discussion was that Morgan, Lewis had no reason to change their original impression of Mr. Meister which they conveyed to us in connection with the other two proceedings in New York.

Q. . . . were you told that Morgan, Lewis had expressed any views on the question of Mr. Meister in the fall or early winter of 1974?

A. Yes, I was told that they had expressed a view.

---

**25.** This request was made by Borden & Elliot one day after a meeting in Philadelphia between Borden & Elliot, Morgan Lewis, and Mensch, in which an agreement was finally worked out between Global and FOF. Notes taken at a meeting the previous week on the same topic indicate Morgan Lewis was present during discussions in which suit against Andersen, among others, was considered. The full extent of these discussions is unknown as memories of the participants are very "hazy". Notes of the earlier meeting contain the notation, "JHL [Morgan Lewis attorney] sd Global shd really only sue AA + accommodation sale people + some directors" (Dilks Exhibit 7, p. 4).

**26.** Orr Exhibit 20.

**27.** Plaintiffs argue in their brief that the substitution of Meister would only be a substitution to carry on claims against the original King defendants, and that it is straining the language to conclude that Meister would be carrying on claims against Andersen. Since much of the discussion with Mensch involved adding Andersen as a defendant, the Court cannot accept such a narrow interpretation.

Q. Who told you that?

A. I don't recall."

While Borden & Elliot did receive suggestions during the fall of other firms who might handle any litigation against Andersen,[28] they never contacted any of these firms, and turned to Meister of Milgrim Thomajan in January, 1975.

Within two weeks of its being retained, Milgrim Thomajan brought the present suit against Arthur Andersen on behalf of the Canadian liquidator. Attorneys at Milgrim Thomajan spent the first four days reading through files Borden & Elliot had amassed (including a binder of documents mentioning Andersen which Morgan Lewis had separated out during their investigation of *FOF v. King*), its own files in *FOF v. King*, documents obtained from Mensch, and documents obtained from other sources. Meister then drafted an opinion letter for the liquidator recommending suit, which the liquidator used to receive the approval of the Supreme Court of Ontario to authorize the commencement of the action.

Attorneys from Milgrim Thomajan drafted the complaint the first few days in February, liberally using sections of the complaint in *FOF v. King* to cover the related allegations. On February 4, 1975, the complaint in *FOF v. Andersen* was filed on behalf of the liquidator by Milgrim Thomajan. The day before the complaint was filed, Joseph Goldstein, an associate at Morgan Lewis, came to Milgrim Thomajan's office in New York and reviewed the draft of the Andersen complaint.[29].

The attorneys involved in this review explain that they wanted someone familiar with the *King* suit to review the *Andersen* complaint since additional investigation had taken place since the *King* suit was filed, and the *Andersen* complaint was consequently considerably more detailed than *King*. Accordingly, they wanted to make sure that the added allegations were consistent with the allegations in *King*.

While Goldstein spent a considerable period of time at Milgrim Thomajan's offices,[30] all persons present state that he spent much of this time waiting while sections of the complaint were prepared,[31] and that he took no part in the actual drafting of the complaint. Goldstein claims that as to the parts of the complaint which he read, he found no inconsistencies and thus made no suggestions to Milgrim Thomajan with respect to the form or substance of the complaint. There is no basis in the record for concluding that Goldstein did in fact convey any information relating to Andersen, confidential or otherwise, to Milgrim Thomajan at this session or on any other occasion.

Two incidents which occurred after the complaint was filed conclude Morgan Lewis' association with any aspect of the Andersen action.

First, in March, 1975, Goldstein of Morgan Lewis and Meister of Milgrim Thomajan met in Houston and jointly discussed with Keplinger & Associates, Inc., an expert in the valuation of natural resource assets, services Keplinger could perform with respect to the natural resource matters in *FOF v. King* and *FOF v. Andersen*.[32] The statement of tasks sent to H. F. Keplinger by Morgan Lewis [33] involved information relevant to the prosecution of *FOF v. Andersen* as well as *FOF v. King*.

---

28. See for example Cihra, Dep. p. 297; Warren Dep. pp. 101–104.

29. It is disputed whether this was Morgan Lewis' idea or Milgrim Thomajan's—each states it was the others (Lewis Dep. pp. 82–83; Meister Dep. p. 375).

30. Approximately 6 hours.

31. Goldstein Dep. pp. 77–93, 107–109.

32. In a subsequent letter from Morgan Lewis to Borden & Elliot discussing the services to be performed by Keplinger, John Lewis wrote:

"(a). The fee proposal is substantially below the original proposal as a result of the negotiations by Joe Goldstein and Bob Meister; and (b). The services requested by me are generally those that would have been requested by Bob Meister in the prosecution of *FOF v. AA*. Accordingly, even if these services are not requested in *FOF v. King*, they apparently would be requested in *FOF v. AA*." Meister Exhibit 21.

33. Goldstein Exhibit 4.

The second incident involves an interview with a former FOF director, Governor Wilson Wyatt. Gov. Wyatt came to Milgrim Thomajan's offices in New York on June 19, 1975, to be interviewed with regard to *FOF v. Andersen.* Goldstein came to New York on that day and also interviewed Gov. Wyatt in Milgrim Thomajan's office for the purposes of *FOF v. King.* Plaintiffs contend that this arrangement was made necessary ". . . as a professional courtesy and convenience . . ." [34] because Gov. Wyatt was a busy attorney. Plaintiffs claim that Meister was not present during most of Goldstein's interview with Governor Wyatt. Goldstein remained in the room during Meister's interview with the Governor but Goldstein states he asked no questions and made no comments at this time.[35]

After the filing of the complaint in *FOF v. Andersen,* Arthur Andersen retained different counsel to represent it in all new actions commenced in the Philadelphia area; and in May, 1975, Andersen requested that Morgan Lewis withdraw from all actions in which the firm represented Andersen. The present attorney disqualification motion was filed thereafter.

## DISCUSSION

The motion to disqualify the firms of Milgrim Thomajan and Morgan Lewis from further prosecuting this action alleges that both firms have violated Canons 4, 5 and 9 of the Code of Professional Responsibility.[36] In addition to requesting the disqualification of Milgrim Thomajan, the defendants also request the suppression of all evidence obtained by plaintiffs as a result of investigation by Morgan Lewis or Milgrim Thomajan, and the dismissal of the complaint. These additional forms of relief will be dealt with after the motion to disqualify the attorneys.

If Milgrim Thomajan's conduct were considered alone, separate from any involvement with Morgan Lewis, there would be no basis for disqualification. Milgrim Thomajan had no prior involvement with Arthur Andersen, and thus was free to investigate and file a complaint against Andersen. The question of disqualification arises because of claims made by defendants concerning the relationship of Arthur Andersen to Morgan Lewis, and the subsequent relationship of Morgan Lewis to Milgrim Thomajan.

The Court will first examine the nature of the attorney-client relationship between Morgan Lewis and Andersen during the investigation and prosecution of this suit, in order to determine if this relationship would require Morgan Lewis' disqualification from participating in the FOF litigation against Andersen. If Morgan Lewis would have been disqualified, then the Court must look at the relationship between Morgan Lewis and Milgrim Thomajan to see if it was sufficiently close, and of such a nature, as to require the Court to impute Morgan Lewis' knowledge of Andersen's affairs to Milgrim Thomajan. If so, Milgrim Thomajan must be disqualified.

### I

As stated earlier, Morgan Lewis represented Arthur Andersen in the Philadelphia area for at least fifteen years. This representation was not terminated until May, 1975, after the filing of the complaint in this action and shortly before this attorney disqualification motion was brought. In determining whether the relationship between Morgan Lewis and Andersen would require Morgan Lewis' disqualification from any involvement in the litigation against Ander-

**34.** Plaintiffs' Memorandum at 33.

**35.** Plaintiffs' response to interrogatories 13 and 14, Meister Affidavit, Exhibit D.

**36.** Canon 4 provides, "A lawyer should preserve the confidences and secrets of a client." Canon 5 provides, "A lawyer should exercise independent professional judgment on behalf of a client." Canon 9 provides, "A lawyer should avoid even the appearance of professional impropriety," ABA Code of Professional Responsibility (1975). "The Code is recognized by both federal and state courts in this circuit as prescribing appropriate guidelines for the professional conduct of the bar." *The NCK Organization Ltd. v. Bregman,* 542 F.2d 128, 129 n. 2 (2d Cir. 1976).

sen, the Court first must determine whether Andersen is a former or an existing client of Morgan Lewis' for the purposes of this motion. This is necessary because the Second Circuit Court of Appeals has enunciated different standards for participation by an attorney in a suit against a client, depending on whether the client is a former or an existing one.

Most of the attorney disqualification cases decided in the last 20 years have evolved out of situations in which an attorney has accepted employment against a *former* client. These cases have uniformly held that an attorney is precluded from accepting such employment "where any substantial relationship can be shown between the subject matter of a former representation and that of a subsequent adverse representation . . . ." *T. C. Theatre Corp. v. Warner Bros. Pictures,* 113 F.Supp. 265, 268 (S.D.N.Y.1953) ["T. C. Theatre"]; *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562 (2d Cir. 1973); *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751 (2d Cir. 1975).

 The Court of Appeals for the Second Circuit recently held that a different test is applicable where an attorney takes part in a suit against an *existing* client. In this situation the propriety of the conduct ". . . must be measured not so much against the similarities in litigation, as against the duty of undivided loyalty which an attorney owes to each of his clients," *Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384, 1386 (2d Cir. 1976) ["Cinema 5"].

Milgrim Thomajan argues that the relationship of Arthur Andersen to Morgan Lewis should be considered to be that of a former client, because Morgan Lewis, having been told by Andersen to withdraw from all representation of Andersen shortly before this attorney disqualification motion was brought, no longer represents Andersen. Andersen contends that the existing client standard should be applied, because it was an existing client at the time Morgan Lewis "accepted employment"[37] from the

liquidator and at the time of the investigation and filing of the Andersen complaint.

 Andersen was an existing client of Morgan Lewis at the time of the investigation and filing of the instant complaint when the alleged conflict of interest arose. Accordingly, the Court finds that Andersen should be considered an existing client for purposes of this motion and that the standard by which to evaluate Morgan Lewis' conduct is that set forth in *Cinema 5* :

"Under the Code, the lawyer who would sue his own client, asserting in justification the lack of 'substantial relationship' between the litigation and the work he has undertaken to perform for that client, is leaning on a slender reed indeed. Putting it as mildly as we can, we think it would be questionable conduct for an attorney to participate in any lawsuit against his own client without the knowledge and consent of all concerned.

\* \* \* \* \* \*

"We do hold, . . . that the 'substantial relationship' test does not set a sufficiently high standard by which the necessity for disqualification should be determined. That test may properly be applied only where the representation of a former client has been terminated and the parameters of such relationship have been fixed.

"Where the relationship is a continuing one, adverse representation is prima facie improper, (citations omitted) and the attorney must be prepared to show, at the very least, that there will be no actual or *apparent* conflict in loyalties or diminution in the vigor of his representation, *Cinema 5,supra,* 528 F.2d at 1386–1387. (Emphasis in original.)

During the 15 years Morgan Lewis represented Andersen, it did so in several types of litigations, through which Morgan Lewis acquired knowledge of Andersen's trade practices and procedures. It had access to Andersen's files, internal memoranda and personnel.

---

**37.** Reply Memorandum in Support of Defendants' Motion to Disqualify Plaintiffs' Counsel, To Suppress Tainted Evidence and to Dismiss the Complaint, p. 7.

During 1973–1975, one group of Morgan Lewis attorneys had access to this confidential information due to their continuing representation of Andersen in Philadelphia, while another group of attorneys at Morgan Lewis was participating in the investigation and filing of a suit against Andersen in the following ways: 1) they sorted out documents mentioning Andersen (obtained from others than Andersen) and sent them to Borden & Elliot, attorneys, who would be deciding whether to sue Andersen;[38] 2) on several occasions they inquired of Borden & Elliot about the status of the Andersen investigation;[39] 3) they gave two legal opinions to the liquidator involving problems in the *Andersen* action;[40] 4) they were instrumental in the choice of a firm to sue Andersen;[41] 5) they sat in on conversations in which the suit against Andersen was discussed;[42] 6) they sent an attorney to New York to review portions of the Andersen complaint before it was filed;[43] and 7) they coordinated their interviews of a witness and an expert with counsel in the *Andersen* action.[44]

■■■ This conduct on the part of the attorneys at Morgan Lewis constituted a breach of the duty of undivided loyalty because there was adverse representation leading to a conflict in loyalties. Even if no confidential information was disclosed, there was at least an appearance of impropriety in this situation, *Cinema 5 Ltd. v. Cinerama, Inc.*, 528 F.2d 1387 (2d Cir. 1976). While such adverse representation might be acceptable with the knowledge and consent of all concerned, a belated attempt to obtain Andersen's consent was unsuccessful, see p. 91 *supra.*

It is apparent from reading the deposition testimony of the Morgan Lewis attorneys,[45] that Morgan Lewis takes the position that such adverse representation within a firm of their size does not require disqualification because a "Chinese Wall" was built in the firm between those attorneys representing Fund of Funds and those representing Andersen. They assert that no information passed between the two groups of attorneys and thus that no confidential information was disclosed.

■■■ First, the Court finds that such a "Chinese Wall" cannot be built within a single law firm. Second, in July and August, 1974, Scott, the Morgan Lewis partner in charge of Andersen litigation, was called in by the Morgan Lewis attorney working on *FOF v. King* to help formulate Morgan Lewis' position if Andersen were to be brought in as a defendant in the *King* action. At this time consideration was given to the question of who should sue Andersen. This consultation belies the contention that the two groups of Morgan Lewis attorneys were totally separated. Thus the Court finds that whatever knowledge was acquired by the Morgan Lewis attorneys representing Andersen during the fifteen years of their representation must be attributed to the Morgan Lewis attorneys representing Fund of Funds.

Accordingly, the Court finds that Morgan Lewis would have been disqualified from bringing this suit against Andersen.

## II

Since Morgan Lewis would have been disqualified, the Court must look at the relationship between Morgan Lewis and Milgrim Thomajan to see if it was sufficiently close, and of such a nature, as to require the Court to impute Morgan Lewis' knowledge of Andersen's affairs to Milgrim Thomajan, that is, whether improper disclo-

**38.** See footnote 12, *supra.*

**39.** See footnote 12, *supra.*

**40.** Splitting the cause of action and the Statute of Limitations, (see pp. 90–91, *supra*).

**41.** See p. 91, *supra.*

**42.** See footnote 25, *supra.*

**43.** See p. 93, *supra.*

**44.** See pp. 93–94, *supra.*

**45.** Morgan Lewis did not submit a brief. Milgrim Thomajan states that Morgan Lewis did not do so because they are not a party to nor represented in these proceedings.

sure of confidential information could have occurred. *NCK Organization, Ltd. v. Bregman,* 542 F.2d 128, 134 (2d Cir. 1976) ["NCK"]; *Hull v. Celanese Corp.,* 513 F.2d 568 (2d Cir. 1975). There were four incidents involving the two firms which related to the *Andersen* action.

■ The first concerns the part Morgan Lewis played in the choice of Milgrim Thomajan to bring the Anderson suit. While the Court finds that Morgan Lewis was instrumental in this choice,[46] we do not believe that such a recommendation by a firm that itself had a conflict of interest is sufficient to extend this taint to the new firm. *NCK, supra,* 542 F.2d at 136 (Mansfield, concurring).

■ The second, and most troubling incident, involved the review by a Morgan Lewis associate of a draft of the *Andersen* complaint the day before the complaint was filed. As explained earlier, the *King* and *Andersen* complaints arise out of the same series of transactions: the purchase, valuation and revaluation of certain natural resource assets. However, the *Andersen* complaint, filed nine months after *King,* and after additional investigation into the facts surrounding the natural resource transactions, is considerably more detailed than the *King* complaint. According to the attorneys involved in the two actions, they wanted someone familiar with *King* to review the *Andersen* complaint to make sure that the added allegations were not inconsistent with those in *King.* Joseph Goldstein, a second year associate at Morgan Lewis, was sent to New York to review the complaint.

Goldstein spent a total of six hours at the Milgrim Thomajan offices on this trip. The complaint was in the process of being drafted when he arrived and he spent considerable time waiting for parts of the complaint to be completed so that he could review them. All persons present state that Goldstein took no part in the actual drafting. They also state that he found no inconsistencies, and thus made no suggestions to Milgrim Thomajan's attorneys with respect to the form or the substance of the complaint.

Goldstein had never performed any legal services on any matter in which Morgan Lewis represented Andersen.[47] He had never discussed Fund of Funds matters with the Morgan Lewis attorneys handling the Andersen account, and at the time that he came to New York to review the complaint he was aware that Morgan Lewis took the position that it could not ". . . assert, evaluate or opine on any claims against Arthur Andersen."[48] All parties state that during most of the time Goldstein was at the Milgrim Thomajan offices he reviewed the background factual allegations in the complaint relating to the natural resources asset transactions, and did not review or comment on any of the actual claims asserted against Andersen.

As a second year associate at Morgan Lewis who had never performed legal services on any Andersen matter, the Court does not believe that Goldstein was in a position to have received any confidential information concerning Andersen. *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751, 753–4, 756–7 (2d Cir. 1975). In addition, all the attorneys in-

46. When it appeared that Andersen might be brought in as a defendant in the *King* action, attorneys from Morgan Lewis first cleared with Meister that Milgrim Thomajan would be free to sue Andersen, and then developed and lobbied for a contingency plan which would call for the substitution of Milgrim Thomajan (see pp. 91–92, *supra*). Morgan Lewis took an active role in working out a deal with Mensch, part of which involved the bringing of a separate suit against Andersen; when Mensch was slow in drafting a complaint against Andersen, two attorneys at Morgan Lewis suggested to Borden & Elliot that they offer Mensch the services of Meister to help him draft such a complaint (see pp. 91–92, *supra*). And finally, in October of 1974, when Borden & Elliot turned its attention to consideration of a suit against Andersen, John Warren, a partner at Borden & Elliot, recalls that Morgan Lewis again recommended that Meister bring the action for the liquidator (see p. 92, *supra*).

47. Goldstein Dep. p. 112.

48. Goldstein Dep. p. 79.

volved in his review of the complaint claim that Goldstein was there solely to review the background factual allegations concerning the natural resource transactions, and was not there to review Andersen's alleged subsequent failures with respect to these transactions. All parties present also agree that he made no comment on anything that he did see. Under the circumstances, the Court finds that there is no realistic chance that confidences were disclosed by Goldstein when he reviewed the Andersen complaint. *Silver Chrysler, supra,* 518 F.2d at 757. Therefore, the Court will not impute Morgan Lewis' knowledge of Andersen's affairs to Milgrim Thomajan on the basis of this contact between attorneys from the two firms.

The remaining two contacts between Morgan Lewis and Milgrim Thomajan concerning Andersen occurred after the *Andersen* complaint was filed. The first involves the joint interview by Goldstein and Meister of Keplinger, a Houston expert in the valuation of natural resources. The second, Goldstein's presence during Meister's interview of Governor Wyatt. As previously stated, the Court does not believe that Goldstein was in a position to have received any confidential information concerning Andersen, and thus it is not realistic to assume that he disclosed any such confidences in these associations with Meister. In addition, much of the information that Keplinger was asked to evaluate and that Wyatt possessed would relate to the general factual problems underlying the natural resource transactions, and not with Andersen's subsequent evaluation; thus it is unlikely that a discussion of Andersen's accounting methods or its trade practices and procedures would have occurred. Therefore, the Court finds that under these circumstances there was no realistic chance that confidences were disclosed by Goldstein.

■ Thus the Court finds that the nature and extent of the four contacts between Morgan Lewis and Milgrim Thomajan were such that it is highly unlikely that any confidential information could have

been disclosed by Morgan Lewis to Milgrim Thomajan. Therefore, while we found that Morgan Lewis would have been disqualified, we will not extend Morgan Lewis' conflict of interest to Milgrim Thomajan, *NCK, supra,* 542 F.2d 128; *T. C. Theatre, supra,* 113 F.Supp. at 271, 272; *American Can Company v. Citrus Feed Co.,* 436 F.2d 1125 (5th Cir. 1971). Accordingly, the Court denies Andersen's motion to disqualify Milgrim Thomajan.

While the situation does not warrant the disqualification of Milgrim Thomajan, we think that the firm should make every effort to keep its contacts with Morgan Lewis regarding Andersen to the absolute minimum during the future course of this litigation. Accordingly, we think that Milgrim Thomajan should withdraw as local counsel in the *King* action.

### III

In addition to disqualification, defendants have requested the suppression of all evidence obtained by plaintiffs as a result of investigation by Morgan Lewis or Milgrim Thomajan, and the dismissal of the complaint. The Court finds that both of these forms of relief are unprecedented and unwarranted.

■ Defendants request suppression of all the evidence obtained by plaintiffs as a result of investigation by Morgan Lewis or Milgrim Thomajan because they claim it is the tainted fruit of an improper investigation conducted by Morgan Lewis. The defendants do not make very clear what they wish to suppress, but it apparently must be all files relating to Fund of Funds which Morgan Lewis has gathered from former attorneys for FOF, from FOF's management companies, and from the Fund's own files (including the 43 documents mentioning Andersen that Morgan Lewis sorted out and sent to the liquidator—any attorney could have obtained these same documents by going through the files). These materials clearly belong to plaintiffs and can be used by them. They were not obtained as a result of Morgan Lewis' relationship to Arthur Andersen. In fact, there is no claim

that Morgan Lewis ever turned over to either the liquidator or Milgrim Thomajan any documentary information it obtained during its 15 year representation of Andersen.

■ Defendants also move for dismissal of the cause of action with prejudice. In light of our ruling on the motion to disqualify, we deny this motion. Even had we disqualified Milgrim Thomajan we would have ruled against dismissal on this ground. The Court of Appeals recently stated in an opinion on an attorney disqualification motion, "[w]e can find no precedent for dismissal of the complaint . . . . The sins of counsel should not be visited upon his client so as to vitiate the latter's cause of action," *W. T. Grant Co. v. Haines,* 531 F.2d 671, 676–7 (2d Cir. 1976). While the Court supposes a situation might arise which was so egregious as to require dismissal, this certainly would not be that case. To penalize the thousands of shareholders in this fund because of attorneys' misconduct would be unjustified.

■ Defendants also move for dismissal under Rule 11 of the Federal Rules of Civil Procedure. There is no evidence to support dismissal on this ground. The evidence warrants a finding that Milgrim Thomajan signed the complaint in good faith and with the belief that there were good grounds to support the claims.

Accordingly, the Court denies the defendants' motion to disqualify the firm of Milgrim Thomajan & Jacobs from further prosecuting this action. It also denies defendants' motions to suppress the evidence and to dismiss the complaint.

SO ORDERED.